### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### PATENT TRADER, INC., Respondent.

### No. 432, Docket 32743.

United States Court of Appeals
Second Circuit.

Argued March 13, 1969.

Decided July 29, 1969.

Nancy M. Sherman, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Baruch A. Fellner, N.L.R.B., Washington, D. C., on the brief), for petitioner.

Hugh P. Husband, Jr., New York City, for respondent.

Before MOORE and FEINBERG, Circuit Judges and McLEAN,* District Judge.

**MOORE, Circuit Judge:**

The National Labor Relations Board (the Board) has petitioned this court for enforcement of its Order issued against Patent Trader, Inc. (the Company), requiring the Company to cease and desist from unfair labor practices found to have occurred in Mount Kisco, New York, where the Company is engaged in commerce.[1] The trial examiner found that the Company violated § 8(a) (5) and (1) of the Act[2] by (1) refusing to bargain in good faith with the Westchester County Printing Pressmen and Assistants Union, Local 366, International Association of Printing Pressmen and Assistants Union of North America (the Union), (2) changing wages, working conditions or other terms of employment of its employees without notifying the Union and giving it an opportunity to bargain collectively concerning such proposed changes, and (3) inducing abandonment or withdrawal from the Union, undermining the Union's status as a bargaining representative, and conveying to the employees the futility of self-organization. Based upon these findings, the trial examiner recommended that the Board order the Company to bargain collectively with the Union, as well as cease and desist from continuing the unfair labor practices. The Board adopted the trial examiner's findings and recommendations in their entirety.

*The Facts*

The Company, a New York corporation with its office and place of business in Mount Kisco, New York, is engaged in the publishing, printing and distribution of a weekly ("The Advertiser") and semi-weekly ("Patent Trader") and other newspapers and in commercial printing. Of approximately 220 Company employees, only its 9 or 10 pressmen and reelmen are involved in this proceeding. In April, 1965 these pressmen and reelmen communicated with Louis Bramley, the vice-president of Local 366, and discussed with him the possibility of affiliating with that union, which served as the bargaining agent for printing pressmen of several establishments in Westchester County, New York. The Union obtained authorization cards from the pressmen and, on May 5, 1965, petitioned for an election. On July 12, prior to the election, the Company posted on its bulletin board a fact sheet explaining why it opposed unionization of the plant, and reviewing the benefits enjoyed by the pressmen. In a "memo to the pressroom" bearing the same date Company president Carll Tucker, in reciting what

---

* Of the Southern District of New York, sitting by designation.

1. Jurisdiction is conferred under § 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e).

2. § 8(a) (1) and (5), 29 U.S.C. § 158(a) (1) and (5) read:
 § 158. Unfair Labor Practices.
 (a) It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title [guaranteeing the right of employees to organize, bargain collectively, etc.] ;
 \* \* \* \* \*
 (5) to refuse to bargain collectively with the representatives of his employees
 \* \* \*.

he believed to be the advantages and disadvantages of unionization, admitted that a union "could negotiate a higher pay scale" but warned that the Company had already lost a "large" customer after the latter had "learn[ed] there might be a union in our press room." Tucker warned that employees would have to be laid off if this business could not be replaced, and that the presence of a union meant the possibility of a strike and consequent damaging circumstances, such as permanent loss of customers. The "memo" also attacked the capacity of Local 366 to bargain, alleging that its officers were elderly and retired job pressmen who were unfamiliar with the needs of rotary pressmen such as those employed by the Company. Tucker also indicated that whereas he doubted that Local 366 "would intentionally put someone out of business just for the sake of securing higher wages," there was a "very good chance" that the International Typographical Union Local 6 of New York (ITU Local 6), led by the "arrogant and autocratic" Bertram Powers who was well-known for forcing newspapers out of business, would be "right behind them" and would organize the Company's composing room employees. Tucker concluded by saying "Quite frankly, I am tired of fighting unions," that he preferred fighting "our competitors" and that he would rather pass on savings of the cost of an election to the employees.

At about this time the Company's production manager, Richard Pollock, called an illiterate employee, Richard Lener, to his office and explained the mechanics of voting to Lener. While being so instructed, Lener was asked how he intended to vote and was reminded that he, Pollock, had given Lener a job at the plant notwithstanding his inability to read and write.

On July 20, 1965, the Union won the election by a vote of 8 to 2. About a half-hour later, Pollock told one Gaetanello, a pressman, "Here I gave you a raise * * * and then you go do this to me." And to Lener, Pollock said, "I took you in here because you didn't know how to read and write and gave you a job, a steady job, and you got to do this to me." Shortly thereafter, Lener's hours were reduced from 37½ to 24 hours per week (then later increased to 25 hours per week, to enable Lener to qualify for welfare and other benefits which the Company accorded to full-time employees).

The Union was certified as the collective bargaining representative for the employees on July 28. On August 3 the Union, through vice-president Louis Bramley, wrote Company president Tucker and requested a meeting to negotiate a collective bargaining agreement. On the same day Company vice-president and treasurer William Heron advised the Union by letter that he would negotiate for the Company, and agreed to observe the Union's earlier request "that there be no changes in working conditions, etc. of pressroom employees during bargaining." Thereafter, between August 10, 1965 and June 29, 1966 the parties held 11 meetings—all at the Company's premises in Mount Kisco. On July 27, 1966, the Union filed the instant unfair labor practice charge. Union attorney John Sheehan was the chief spokesman for the Union at these meetings while Company attorney Hugh Husband and treasurer Heron shared the negotiating task for the Company. Heron testified that prior to the first meeting he met with Tucker and Husband and adopted "the strategy that would be followed in the collective bargaining negotiations," namely, refusing to bargain on economic matters "until noneconomic matters had been resolved."

The first meeting was held on August 10, with discussion centering around the Union's standard contract. At the second meeting, held on September 16, the parties discussed welfare and pension plans and disagreed on several substantive provisions of the standard contract including exclusivity of foreman authority, scope of arbitration and seniority. When the Union asked for the Company's response to certain economic pro-

posals Husband, the Company's spokesman, replied that he was not then prepared to formulate a Company position. The Union granted his request for a two-week recess to enable him to prepare Company proposals.

The third meeting was held on September 30, with the Company presenting detailed counter-proposals on the non-economic portions of the Union's standard contract. Upon the Union's complaint concerning the Company's omission of economic proposals, Husband replied, in Sheehan's words, that "he had been working so hard getting the other things together that he didn't have time to examine the Company's proposal on economic issues." At the fourth meeting, on October 14, discussion still centered around the Company's non-economic counter-proposals which, for the duration of the bargaining sessions, became the negotiating text. The Union agreed to 10 Company clauses, submitted counter-proposals on 10 others and rejected 5 Company proposals. Sheehan, viewing the Union as having made "substantial concessions," noted that the Company, at the next meeting, "should be in a position to give the Union a counter-proposal on all the open issues, including the economic issues." But at the next (fifth) meeting, negotiations proceeded "very slowly" and the Union repeated its complaint that the Company had not as yet commented on the economics of the contract. The sixth meeting was similarly unproductive. After three postponements, the seventh meeting was held on December 29. At this meeting, termed a "conference" by the trial examiner, the Union and the Company each made concessions but remained apart on other issues. The meeting became "rather intense" upon the Union's request that the Company, following lunch, state its position on the open Union draft proposals, including the economic clauses. Husband insisted that such a course was "useless" because "the whole point" of the Company's preparation of the counter-proposals was to bargain from those and that it would be "foolish to go back" to the Union's standard contract. Husband, although noting that the Company would not discuss economic matters until agreement was reached on all non-economic matters agreed to review the Union's draft proposals after the lunch recess. When the conference re-convened, Husband went through the Union draft agreement section by section, noting those sections already agreed upon, those which the Company rejected outright and those which —since they dealt with economic matters —would not be dealt with at that time "consonant with [the Company's] policy to settle other non-economic matters * * * before we tackle the economics." Sheehan reacted sharply to this position, asserting that the Company had promised to make economic proposals on "two occasions, including today," that the Company was not dealing fairly with the Union and that "the negotiations could not go on like this." Husband, however, reiterated his position, and an impasse was reached. Sheehan thereafter sought the assistance of the Federal Conciliation and Mediation Service to help compose the parties' differences but such intervention was impossible because of Company opposition. At the termination of the December 29th conference, Husband withdrew as bargaining representative for the Company "because of the expense involved." Heron, who had a "familiarity with the issues" but no prior bargaining experience, became the Company's sole negotiator.

With the New Year and the attempt to bring the Mediation Service into the negotiations came a month-long delay in the bargaining. During the month of January, 1966, two incidents occurred which were found by the trial examiner to constitute violations of the Act. The first was a fortuitous meeting of Kenneth White, the then Union shop steward, and production manager Pollock at a restaurant early that month. After a few drinks the conversation turned to Union matters and Pollock told White that he and another pressman were "management material" with a "fine fu-

ture in the Company" and that if they remained in the Union they would damage their chances for advancement at the Company. Pollock said that White "was making a mistake" by encouraging the Union and that "there must be some way" to "vote the Union out." White was assured that there would be no reprisals if there was a decision to get "rid of the Union." Finally, Pollock asked White not to mention or repeat the conversation to anyone because he "could get in trouble for it."

The second incident occurred on January 31 when, at the invitation of president Tucker, four of the pressmen lunched with him at an "exclusive restaurant." Following food and drinks, Tucker inquired about the "trouble in the pressroom." The employees complained about long hours and low wages, to which Tucker replied that the Company was "young and growing," that profits were plowed back into the Company and that there were "brighter days ahead." Tucker suggested that even with a union they couldn't get more money because "you can't get blood from a stone." With regard to the pending contract negotiations Tucker stated that "he didn't have to sign a contract at all" and that if there were a strike he could replace the men with a whole crew of "trained people." He added that while he could probably tolerate Local 366, he was concerned that the ITU Local 6, led by Powers, would try to get a foothold and put the Company out of business. When confronted with the lack of progress in the negotiations and with complaints by the employees that they had "nothing to look forward to," Tucker indicated that he "had to continue bargaining" and that, although he had prospects of future business, nothing could be done until some settlement was reached between the workers and the Union or between the Company and the Union. Tucker encouraged the revival of the "Communications Committee," through which employee grievances had once been transmitted to the manage-

ment, and further invited the employees to present grievances directly to him.

Five days before this meeting, on January 26, 1966, the bargaining sessions had resumed. Heron, speaking for the Company, began this eighth session by reiterating the Company's refusal to speak to any economic issues until the non-economic issues were disposed of. Sheehan, for the Union, objected, stating that an offer on all the issues should be used towards inducing a compromise. Heron responded that he "wasn't experienced in those things," and the parties then proceeded to review their outstanding differences on non-economic issues. During the course of the meeting the Union made a number of concessions on many of the non-economic issues. Prior to the end of the meeting Sheehan said that, in view of these concessions, the Company "should be in a position to make a counter proposal * * * on all the outstanding issues, including the economic issues." Heron replied that he needed additional time "to go into those things."

At the ninth meeting (February 18) the remaining divisive non-economic issues were reviewed and the Company agreed to respond in detail to each of the Union's economic demands at the next meeting. But at the tenth meeting (March 11) the Company merely explained its prevailing practices in economic areas such as overtime, holidays and sick leave. Upon the Company's refusal to submit a counterproposal on wages, the climate of the negotiations became quite heated. Sheehan complained that the Union had been waiting for months and the Union's newly-elected president, Scanlon, accused the Company of stalling. Heron warned the Union not to "threaten" him, but promised a wage proposal at the next meeting.

By letters of March 17 and May 25, however, the Company withdrew its promise to discuss a wage offer at the next meeting. These letters stated that the Company would not discuss the question of wages until all unresolved eco-

nomic issues were settled, since the Company did not believe it would be helpful to go into purely economic matters until agreement was reached on other matters having a "decisive * * * economic impact," such as pension and welfare programs. A second attempt to bring in the Federal Mediation and Conciliation Service proved futile, since Heron, on behalf of the Company, stated that such intervention would be a waste of time.

The final bargaining session took place on June 29, 1966. Heron stated the Company's current practices regarding subsidiary economic issues such as welfare plans, pension plans, holidays, vacations, severance pay, overtime pay and sick leave, noting that the Company was unwilling to depart from its position on these matters. He stated that he was "unprepared" to comment on wages. Sheehan then agreed to withdraw the Union proposals on the subsidiary economic issues and accept the existing Company practice with respect to each of those items if the Company would agree to a Union proposal for a two-year contract and a package wage plan. Heron asked for more time to study the offer and promised to contact Sheehan within two days.

On July 1 the Company, through Heron, wrote Sheehan that it could not accept the Union's "package" proposal because of the unresolved non-economic issues, and requested the arrangement of another meeting. Sheehan expressed his disappointment by a letter of July 8 but suggested a meeting within a week. When Heron advised Sheehan that he would be unable to meet the following week but desired to be contacted the week thereafter the Union, on July 29, filed the instant unfair labor practice charges.

While these charges were pending Sheehan, in response to an indication by Heron that talks should continue, requested another meeting. The parties agreed to meet on August 22. Meanwhile, during the first week in August, the pressmen were notified that a meeting would be held with production manager Pollock at a local inn. At the meeting, Pollock bought the six or seven attending pressmen beer and pizza, then encouraged a "free for-all" discussion. Pollock reminisced upon his own experience with unions, stating that he had had some "very good days" as a union member but had also "hated and dreaded the days when he had to walk and carry a placard." ' He asked the men to "think twice" before they committed themselves. He further stated that he didn't know if Company president Tucker would approve of the employees forming their own union but he didn't think Tucker wanted any union, specifically mentioning ITU Local 6. Pollock hinted at the possibility of a "very big contract * * * if the air was clear" and, when asked what prompted that remark, said "I know what it's like to walk a picket line." Pollock concluded by telling the employees that he spoke to them "strictly on his own initiative" and that they would have to make their own decisions.

On August 12, 1966, following "a number of informal discussions" among the employees, the pressmen voted to disassociate themselves from Local 366. They further voted "for another [NLRB] election and * * * to try and form [their] own local." The results of this decision were reported to the Company. On August 19 Heron's secretary informed Sheehan by telephone that the scheduled August 22 meeting had been canceled. A subsequent explanatory letter, dated August 30, said that the meeting had been canceled because "it was made clear * * * that Local 366 did not represent a majority of the employees in the pressmen's unit." The letter also enclosed a copy of a Company petition asking the Board to conduct another election. No further bargaining sessions were held between the parties.

In addition to the above facts, the trial examiner found that in the period between the Union's certification and the initiation of the unfair labor practice charges, the Company "repeatedly"

granted wage increases to the pressroom employees. The increases varied in size and frequency according to the level of the performance of the various employees. The trial examiner found the record to show that while "in some instances (including the period before the Union's certification) employees were given increases approximately every six months, in others the time intervals, as well as amounts, varied." The Union was never consulted before these raises were announced or effectuated.

Upon a review of the record we believe that, with the exception of the findings as to unlawful wage increases, there is substantial evidence to support the findings of unfair labor practices found by the trial examiner and adopted by the Board. We, therefore, grant enforcement of the Board's Order except that, for reasons to be discussed below, we modify that portion of the order requiring the Company to bargain with the Union and order such bargaining only after a Board-conducted election has been held.

*Good Faith Bargaining*

▇ Turning first to the alleged failure of the Company to bargain with the Union in good faith in violation of § 8(a) (5) and (1) of the Act, we find that substantial evidence on the record as a whole supports the finding of the trial examiner and the Board that the Company "entertained no sincere desire and made no genuine effort" to conclude an agreement with the Union. It is well-settled that the "performance of the duty to bargain requires more than a willingness to enter upon a sterile discussion of union-management differences." N. L. R. B. v. American National Insurance, 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952). And although "the obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained," N. L. R. B. v. Herman Sausage Co., 275 F.2d 229, 231 (5th Cir. 1960), more is required than mere "surface bargaining" or "giving the Union a runaround while purporting to be meeting the Union for purpose of collective bargaining." N. L. R. B. v. Herman Sausage Co., *supra*, p. 232, quoting N. L. R. B. v. Athens Mfg. Co., 161 F.2d 8 (5th Cir. 1947). See also N. L. R. B. v. National Shoes, Inc., 208 F.2d 688, 691 (2d Cir. 1953); N. L. R. B. v. Fitzgerald Mills Corporation, 313 F.2d 260, 266 (2d Cir. 1963). Whether the Company bargained in good faith normally rests upon "a finding of motive or state of mind which can only be inferred from circumstantial evidence," N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 139–140 (1st Cir.), cert. denied 346 U.S. 887, 74 S. Ct. 139, 98 L.Ed. 391 (1953), and "[t]he previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations [which] constitute the raw facts for reaching such a determination." Local 833, UAW–AFL–CIO, etc. v. N. L. R. B., 112 U.S.App.D.C. 107, 300 F.2d 699, 706, cert. denied Kohler Co. v. Local 833 etc., 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962).

▇ As shown above, the Company here manifested resentment towards unionization even before its election victory and certification, when president Tucker posted his "memo to the press room" stressing the dire consequences of organization, the loss of a large customer and the possibility of employee layoffs. Shortly after the Union's election success, production manager Pollock criticized employee Lener for voting pro-Union. Subsequently, Lener's workweek was reduced by more than 13 hours. Anti-union conduct continued throughout the negotiations. Employee White was advised that his alignment with the Union was jeopardizing his chances for managerial advancement within the Company. Tucker told a group of pressmen that no one could force him to sign a contract, that he could quickly get new men for their positions if they should strike, that he deplored the possibility of having to deal with ITU Local 6, and that the pressmen

should come directly to the management with their grievances. We think the trial examiner and the Board were justified in finding that "such conduct tends to show that the Company was more bent on destroying the Union than on reaching agreement at the bargaining table."

We further think that the trial examiner and Board were warranted in finding that the Company failed to bargain in good faith about wages and other economic items. Even prior to the undertaking of the negotiations, the Company had resolved not to discuss or "tackle" any economic matters until all non-economic issues were resolved. Whenever the Union requested a Company position on economic matters the Company would respond that it needed more time to formulate its proposals. But the Company, as part of its admitted policy, never intended to submit such proposals until "every single" non-economic issue had been settled and in fact never did submit such a proposal. The Union repeatedly conceded contested positions on non-economic issues and even offered to accept each and every prevailing economic practice of the Company if the Company would agree to a stated wage increase and a two-year contract but the Company rejected the plan— again on the ground that not all non-economic issues had been settled. The trial examiner and Board were therefore warranted in finding that "[b]y postponing or removing from the area of bargaining—to the very end of negotiations—

most fundamental terms and conditions of employment (wages, hours of work, overtime, severance pay, reporting pay, holidays, vacations, sick leave, welfare and pensions, etc.) [the Company] reduced the flexibility of collective bargaining, [and] narrowed the range of possible compromises" with the result of "* * * rigidly and unreasonably fragmenting the negotiations * * *." See Vanderbilt Products, Inc. v. N. L. R. B., 297 F.3d 833 (2d Cir. 1961) (Per Curiam).[3] While it is true, as the trial examiner points out, that "there is no hard and fast rule concerning the order in which contract terms will or should be discussed" and that there is nothing illegal in the Company's aiming for the best possible contract, the refusal of the Company to make "significant concessions" to the Union even after the Union had accepted "all but a few of [the Company's] basic non-economic proposals constitutes evidence of bad faith on the part of the Company. N. L. R. B. v. Century Cement Mfg. Co., 208 F.2d 84, 86 (2d Cir. 1953).

*Interference With Employees*

We also concur with the conclusion of the trial examiner and the Board that the Company interfered with, restrained and coerced employees with respect to Union activities in violation of § 8(a) (1) of the Act. At the meeting of January 31, 1966, president Tucker told several of the pressroom employees that he "didn't have to sign a contract at all" and that "nobody could

---

3. In the *Vanderbilt Products* case, the court, at 297 F.2d 833–834, commented as follows:

"The terms upon which petitioner's attorney required agreement before further negotiations could be had were a completely open shop, with no union membership, however restricted; no maintenance of membership or checkoff; absolute employer right to discharge or layoff without restriction or seniority limitation; and a five-year term for the contract. The trial examiner, in finding a refusal to bargain in good faith, quoted this appropriate statement by Chief

Judge Magruder in a similar case, N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 205 F.2d 131, 139, certiorari denied Reed & Prince Mfg. Co. v. N. L. R. B., 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391: 'It is difficult to believe that the Company with a straight face and in good faith could have supposed that this proposal had the slightest chance of acceptance by a self-respecting union, or even that it might advance the negotiations by affording a basis of discussion; rather, it looks more like a stalling tactic by a party bent upon maintaining the pretense of bargaining.' "

force him to sign one." In the context of Tucker's other communications to the employees, these statements operated as a violation of the Act by conveying to the employees the futility of self-organization. N. L. R. B. v. Fitzgerald Mills Corp., supra, 313 F.2d at 268–269; Bon-R Reproductions, Inc. v. N. L. R. B., 309 F.2d 898, 903 (2d Cir. 1962). At the same meeting Tucker made another independent violation of the Act by inviting employees to present grievances to him directly or through the re-activation of the Company's defunct "Communications Committee," thereby undermining the position of the employees' chosen bargaining representative. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 683–685, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Black-Clawson Co., Inc. v. Int'l Assoc. of Machinists, 313 F.2d 179, 184–185 (2d Cir. 1962). Finally Pollock, in the meeting of August 1966 with pressroom employees, said that he did not believe that Tucker wanted any union and that "if the air was clear" there was the possibility of a "very big contract" and "more work." Such promises of benefit for the purpose of encouraging abandonment of the Union violate § 8(a) (1) of the Act. N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); N. L. R. B. v. Gotham Shoe Mfg. Co., 359 F.2d 684, 685 (2d Cir. 1966); Edward Fields, Inc. v. N. L. R. B., 325 F.2d 754 (2d Cir. 1963); N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 76–77 (2d Cir. 1965); Reserve Supply Corp. v. N. L. R. B., 317 F.2d 785, 787–788 (2d Cir. 1963). The Company suggests that it should not be held accountable for the statements of Pollock since he was speaking "strictly on his own initiative." But a company is responsible "for acts of a supervisor when 'employees would have just cause to believe that he was acting for and on behalf of the Company.'" Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176, 179 (2d Cir. 1965), citing N. L. R. B. v. Texas Ind. Oil Co., 232 F.2d 447, 450 (9th Cir. 1956). Certainly there was just cause for such a belief in the instant case.

### Wage Increases

We are unable to agree with the conclusion of the trial examiner and Board that the Company's unilateral wage increases provide "still further proof of its failure to comply with the statutory requirements of good-faith bargaining." The trial examiner found that the "wage increases varied in intervals and amounts from one individual to another and were in no sense automatic" and concluded that this conduct, in the light of its refusal to discuss wages, "naturally tended to undermine the authority" of the Union's bargaining representative. Earlier in his decision, however, the trial examiner qualified the facts from which he drew this conclusion in his finding that "[t]he record further shows that although in some instances (including the period before the Union's certification) employees were given increases approximately every six months, in others the time intervals, as well as the amounts, varied." It is uncontested that the Company did not consult the Union prior to granting these increases.

Upon reviewing the record, we conclude that the wage increases were given pursuant to normal Company policy and that such increases existed as a "working condition" of the Company before the negotiations started. In view of the Company's written promise not to change any working conditions—e. g., salary increases to employees at roughly six-month intervals—failure to grant the usual increases might have been held against the Company as constituting punitive action against those engaging in Union activities. In N. L. R. B. v. Katz, 369 U.S. 736, 746–747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962) the Supreme Court found improper certain raises which "were in no sense automatic, but were informed by a large measure of discretion." In *Katz*, the danger seen in such discretionary increases during bargaining was two-fold: (1) that there would be no way for a union "to know

whether or not there has been a substantial departure from past practice" and (2) that the actual process of discussion would be obstructed through coercion of the represented employees. In this case, the Union never protested the various increases as they were granted, see N. L. R. B. v. Superior Fireproof Door & Sash Co., Inc., 289 F.2d 713, 720 (2d Cir. 1961), even though the Union did in fact know about them, and about the Company's general practice of wage increases on a roughly semi-annual basis. As to the second point, it is difficult to see how continuance of a wage-increase policy which the employees would otherwise expect can be viewed to obstruct bargaining negotiations merely because it continues, as before, during those negotiations. On this point, we think that substantial evidence does not support a finding that § 8(a) (1) or (5) were violated.

## The Remedy

Having found—apart from the issue of the wage increases—that the Company's conduct did violate § 8(a) (5) and (1) of the Act, it remains for us to determine whether direct bargaining with the Union, as ordered by the Board, is the appropriate remedy here. As stated by this court in the recent decision of N. L. R. B. v. Pembeck Oil Corporation, 404 F.2d 105, 112 (2d Cir. 1968):

"It is well established that the Board may properly order an employer found to have committed unfair labor practices to bargain directly with a Union which lost its majority subsequent to the employer's wrongful refusal to bargain with it. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). Nevertheless, we are not unmindful of the potency of such a remedy. Since it dispenses with the necessity of an election, there is always the risk that a bargaining representative may be imposed on employees, at least for a time, when they no longer wish it to represent them. N. L. R. B. v. Flomatic Corp., 347 F.2d 74 (2d Cir.

1965); N. L. R. B. v. Better Val-U Stores of Mansfield, Inc., 401 F.2d 491 (2d Cir. decided September 10, 1968)."

In N. L. R. B. v. Flomatic Corp., *supra,* in which the Board had found a § 8(a) (1) violation, this court called a bargaining order "strong medicine" because, under the facts of that case, it dispensed with the necessity of a prior secret election and therefore created "a possibility that the imposition of such an order may unnecessarily undermine the freedom of choice that Congress wanted to guarantee to the employees, and thus frustrate rather than effectuate the policies of the Act." 347 F.2d at 78. The court then formulated the test relevant in this circuit to § 8(a) (1) cases, namely, that enforcement of a bargaining order without a secret election should only be mandated "where the employer's conduct has been so flagrantly hostile to the organizing efforts of a union that a secret election has undoubtedly been corrupted as a result of the employer's militant opposition." 347 F. 2d at 78. The *Flomatic* rule was extended in *Better Val-U Stores of Mansfield, Inc., supra,* to a situation involving a § 8(a) (3) violation [wrongful discharge of an employee for union activities] as well as a § 8(a) (1) violation. In spite of Judge Hays' dissenting opinion in *Flomatic* (urging that issues concerning employer interference were peculiarly within the area of the Board's expertise) the majority in *Val-U Stores* felt "compelled," on the facts before it, to follow the majority in *Flomatic* since the unfair labor practices in that case were not viewed as " 'so flagrantly hostile' to the union that it [was] clear that both a secret election or an attempt to bargain * * * would have been futile." 401 F.2d at 494.

In *Pembeck,* decided after *Better Val-U Stores,* Judge Hays again dissented, pointing out that neither *Flomatic* nor *Val-U Stores* had reached to § 8(a) (5) cases and urging that the "flagrant violation" standard not be extended to such cases. In support of his position Judge

Hays pointed to a number of post-*Flomatic* § 8(a) (5) cases [4] in which the bargaining orders were enforced. The majority in *Pembeck,* however, rejected the argument that all orders to bargain following § 8(a) (5) violations should be enforced "by rote," suggesting that "the finding of an unlawful refusal to bargain does not *ipso facto* and in all cases lead to the conclusion that an order to bargain must always be the only remedy for the violation." 404 F.2d at 112. The *Pembeck* majority then went on to require an election to determine the bargaining representative desired by the employees.

In N. L. R. B. v. Adhesive Products Corporation, 281 F.2d 89, 91 (2d Cir. 1960), we noted that the employees " * * * should not be made the pawns of any union, the company, or of the Board * * * [and] should have an opportunity to express their choice in the manner provided by law." In this case, requiring a new election is the best way to effectuate this policy.

On August 12, 1966, in a secret ballot taken without interference by the Company, the employees decided that they did not wish to continue as members of Local 366. Testimony heard before the trial examiner indicated that disenchantment with Local 366 began in January of 1966. Many of the employees had concluded that the Local 366 representatives "were not qualified to determine how many men and who goes where on the press and how the hourly wage should be," and that the Union hadn't "kept in touch with them." There were complaints about faulty membership cards which had been issued without the proper validation stamps and were therefore "valueless." The shop steward had called the International Union office in Tennessee and learned that the International had no record of a union at the Company and that the required dues had never been received. The employees further complained that the Union had failed to keep in contact with them regarding the negotiations and had not allowed a representative of the employees

4. The majority in *Pembeck* addressed the cases cited by Judge Hays and distinguished them as follows:
"* * * we do not take action here, as the dissenting opinion [in *Pembeck*] suggests, which is inconsistent with those cases subsequent to *Flomatic* in which we held a bargaining order to be an appropriate remedy for an § 8(a) (5) violation based upon a card majority. In each of those cases, the conduct on which the unfair labor practice findings were predicated was found to be clearly hostile to the union, and without question to have contaminated the results of any future election. Indeed, Judge Hays speaking for the majority in Bryant Chucking Grinder Co. v. N. L. R. B., 389 F.2d 565, 568 (2d Cir. 1967) made it clear that the bargaining order was appropriate (in § 8(a) (1) cases) because 'the employer deliberately destroyed the union's majority.' And, in examining those cases in which the possible applicablity of *Flomatic* was considered and then rejected, we observe that in N. L. R. B. v. Consolidated Rendering Co., 386 F.2d 699 (2d Cir. 1967), the employer was found to have violated § 8(a) (1) by threats of reprisals, promises of benefits and coercive interroga-

tion of its employees, all of which were for the purpose of causing the Union's majority to be dissipated and had the effect of making a free election impossible; and in N. L. R. B. v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2d Cir. 1966), the employer similarly engaged in a course of conduct, including threats and promises, the purpose of which was to destroy the Union's majority; also in Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176 (2d Cir. 1965), the employer in addition to violating § 8(a) (1) and (2) by threatening its employees and attempting to form a company dominated bargaining committee, had clearly demonstrated the bad faith of its refusal to bargain by refusing even to examine the authorization cards evidencing the union's majority. Thus, contrary to our dissenting brother's view, those cases are in no way undercut by our holding on the particular facts before us, where the employer's unfair labor practices have been as minimal as we have indicated and its conduct does not preclude a fair election in the future, and particularly where there is a considerable doubt as to the employees' continued desire to be represented by the Union." 404 F. 2d at 112–113.

to attend the negotiations. Testimony indicates that there were argumentative meetings between the employees and the Union and that the employees had concluded that "Local 366 represented job shop pressmen and [they, the employees, were] newspaper pressmen" and that as far as the employees know, "Local 366 didn't represent any newspaper in Westchester County." One of the employees summed up the feeling toward the Union in January of 1966 by testifying that he and his colleagues were "disappointed in and disgusted with the Union" and that the Union " * * * let us all down * * * and played us all for chumps." In August, after a number of informal discussions about the Union, the employees decided to hold a secret ballot election to determine the future course of their association with the Union. Following the balloting, the majority voted "decidedly for another election and it was decidedly [sic] to try and form our own local."

 This testimony did not prevent the trial examiner from finding violations of the Act since "the employees' defection and Union's majority loss [were], at least in substantial part, attributable to [the Company's] unfair labor practices * * *." For the purposes of determining the proper remedy, however, we think such evidence bears on whether the Company's conduct has been "flagrantly hostile" within the meaning of *Pembeck* and its predecessors. On balance, while agreeing that the Company's anti-union expressions and bargaining-table delays may have had some influence on the employees' secret ballot decision of August 12, 1966, we think that such conduct should not preclude a Board-conducted election before bargaining where, as here, "there is considerable doubt as to the employees' continued desire to be represented by the Union," *Pembeck, supra,* 404 F.2d at 113, and where much of the dissatisfaction felt toward the Union by the employees can be accounted for by acts of the Union itself.

We are not unmindful of the recent decision of the Supreme Court (June 16, 1969) in the group of cases which will be referred to as *Gissel Packing*, 395 U. S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (October Term, 1968). The subject matter and scope of those cases are best ascertained from the Court's own statement that they involve the extent of an employer's duty to recognize a union without a Board election on the basis of authorization cards from a majority of the employees and to bargain on that basis. The Supreme Court also vacated the judgment in *Pembeck*, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 and remanded for further consideration by the Board in the light of *Gissel Packing* and the principles therein enunciated as to authorization card cases.

The teaching of these decisions does not apply to the narrow fact situation presented here. There is no issue as to an election because an election was held, the Union won and bargaining commenced. There is no issue even now as to the propriety of the election. Both employer and employees have indicated a desire for another election. The question for resolution here is: where the employees have voted to disassociate themselves from the Union which originally prevailed in an election and where there is no proof that this desire for disassociation was other than a voluntary act by the employees, will a federal court foist upon the employees an order to bargain with a union which they, according to their latest decision, no longer regard as the representative of their choice. This is not a case of allowing the employer "to profit from [his] own wrongful refusal to bargain." See Franks Bros. Co. v. N. L. R. B., 321 U.S. 702 at 704, 64 S.Ct. 817 at 818, 88 L.Ed. 1020, but rather an attempt to secure for the employees that which the statute grants to them. Nor would it be of solace to them to be told that they would have to live with a union not of their choice for only a year and until decertification. Surely the courts will not be

so unrealistic when the solution of a current election is at hand.

We further note that although the passage of time between the filing of these charges and the issuance of the Board's bargaining order cannot, in and of itself, constitute a basis for conditioning enforcement upon a new election, N. L. R. B. v. Katz, 369 U.S. 736, 748, f. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962),[5] nearly three years have passed since the employees held the secret ballot election in which they repudiated the Union. In view of the Supreme Court's statement in *Katz, supra,* that "[i]nordinate delay in any case is regrettable * * *," 369 U.S. at 748, f. 16, 82 S.Ct. at 1114, and in view of the possibility that there may have been a change of personnel in the pressroom since the secret ballot was taken, we suggest that an election requirement is made no less appropriate by the passage of time in this case.

Confident that the Company stands sufficiently warned against anti-union activities by our affirmance of the Board's findings, yet convinced that enforcement of the Board's order to bargain immediately with a Union repudiated by the employees is not in the interest of the employees under the facts before us, we believe that the Board should have ordered a new election within a reasonable time to permit the employees to express their choice as to a bargaining representative.

The Board's order will be enforced in all respects except as indicated above, and the direction to bargain is modified as set forth above.

FEINBERG, Circuit Judge (Concurring and dissenting):

I concur in the holding that the Board properly found violations of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act. I respectfully dissent from the failure to enforce that portion of the Board order which requires the Company to bargain.

After carefully documenting the failure of the Company to bargain in good faith with the Union, the majority opinion nevertheless refuses to enforce the Board's order designed to remedy that egregious violation of the National Labor Relations Act. The decision undermines the policy of the Act, is not supported by authority, and indeed flies in the face of the recent Supreme Court decision in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The lesson for any alert employer from this ruling is that if you stall long enough you may lose the battle with a union but still win the war.

In May 1965, the Union obtained authorization cards from the Company's employees and petitioned the Board for an election. Thereafter, the employees selected the Union in a secret ballot election despite the vigorous opposition of the Company, and the Union was duly certified as the bargaining representative in July 1965. For the next year, however, the Company refused to bar-

---

5. In footnote 16, the *Katz* court said:
 "The company urges that, because of the lapse of time between the occurrence of the unfair labor practices and the Board's final decision and order, and because the union was repudiated by the employees subsequently to the events recounted in this opinion, enforcement should be either denied altogether or conditions on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. The argument has no merit. Franks Bros. Co. v. [National] Labor [Relations] Board, 321 U.S. 702 [64 S.Ct. 817, 88 L.Ed. 1020]; [National] Labor [Relations] Board v. P. Lorillard Co., 314 U.S. 512 [62 S.Ct. 397, 86 L.Ed. 380]; [National] Labor [Relations] Board v. Mexia Textile Mills, Inc., 339 U.S. 563, 568 [70 S.Ct. 826, 829, 833, 94 L.Ed. 1067]. Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b)."
 *Cf.* Judge Friendly's concurring opinion in Bryant Chucking Grinder Company v. N. L. R. B., 389 F.2d 565, 572 (2d Cir. 1967), with his majority opinion in N. L. R. B. v. Superior Fireproof Door & Sash Co., Inc., 289 F.2d 713, 723–724 (2d Cir. 1961) (decided prior to Katz, supra).

gain in good faith with the Union, continually adopting delaying tactics while giving false assurances to the Union. It is that conduct which the Board order is designed to remedy.

The majority finds support in earlier decisions of this court for conditioning a bargaining order on an election: NLRB v. Flomatic Corp., 347 F.2d 74 (2d Cir. 1965); NLRB v. Better Val-U Stores of Mansfield, Inc., 401 F.2d 491 (2d Cir. 1968); and NLRB v. Pembeck Oil Corp., 404 F.2d 105 (2d Cir. 1968). However, none of those cases involved a union that had been duly certified after a Board conducted election. Moreover, in *Flomatic* and *Better Val-U Stores* there was no finding by the Board of a refusal to bargain; rather, as the majority points out, the Board there sought enforcement of its bargaining orders to remedy 8(a)(1) and (3) violations. In refusing enforcement, this court called a bargaining order "strong medicine," emphasizing employee freedom of choice and the preference in the Act for an election to determine that choice. But, however strong may be the medicine of a bargaining order in 8(a)(1) and (3) cases, both *Flomatic* and *Better Val-U Stores* make clear that it is the normal prescription for remedying a violation of 8(a)(5). It is true that *Pembeck* was an 8(a)(5) case, the union there having been selected by representation cards rather than by election. However, on June 23, 1969, the Supreme Court granted certiorari and summarily vacated the judgment in that case with instructions that it be remanded to the Board for further consideration under the criteria to be applied by the Board in representation card cases under the Court's decision in NLRB v. Gissel Packing Co., *supra.* See 395 U.S. 828 (1969).

It is important to emphasize what this case is not. It does not involve use of union authorization cards to justify a bargaining order; the union here was certified after an election. Cf. Wheeler-Van Label Co. v. NLRB, 408 F.2d 613 (2d Cir. 1969). It is not a case in which a union seeks to set aside an election; the union here won the election. The Board's order to the Company to bargain issued because the Company had flouted the result of the election. The choice here is not between a bargaining order or an election in the first instance, as in the cases relied on by the majority, but between requiring two elections rather than just one. Thus, the question in this case is whether this court should set aside a bargaining order, even though there has been an election, because it now has doubts as to the employees' present desires. While concern for employee freedom of choice is certainly appropriate, for several reasons it does not justify modifying the Board order in this case.

First, the decision actually gives an employer an incentive to disregard its duty to bargain in the hope that over time the union—because of employee turnover, internal dissension, or, more likely, lack of progress in negotiating a contract—will lose its majority status. In NLRB v. Gissel Packing Co., *supra,* 395 U.S. at 607–614, 89 S.Ct. 1937–1940, the Supreme Court has reminded us of the compelling reason for giving the Board authority to enter a bargaining order:

> If the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him "to profit from [his] own wrongful refusal to bargain," Franks Bros. Co. v. NLRB, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1943), while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain; and any election held under these circumstances would not be likely to demonstrate the employees' true, undistorted desires. [Footnotes omitted.]

Thus, while seeming to protect employee rights in this case, the majority opinion will in the long run serve to erode them.

It gives a glimmer of hope to an employer bent on disregarding its obligations that it can do so with impunity, thus undercutting the very heart of the Act— the guarantee to employees of the right to bargain collectively with their employer through representatives of their own choosing.

Second, if the employees have indeed changed their minds and no longer wish to be represented by their duly certified representative, they already have statutory relief. Thus, section 9(c) of the Act, 29 U.S.C. § 159(c), provides that employees may petition the Board for a decertification election. Congress apparently thought that this would be sufficient protection for employees, and the Board here has concurred in that judgment. Cf. NLRB v. Gissel Packing Co., supra, 395 U.S. at 612–613 n. 33, 89 S.Ct. at 1939. If a court wants to make sure that employees are aware of that right, it might require the Board to give the employees actual notice of it. See NLRB v. Priced-Less Discount Foods, Inc., 405 F.2d 67 (6th Cir. 1968). However, in the absence of the most compelling reasons, a court should not substitute its judgment as to suitable remedy for that of the agency to which Congress has assigned that task. "[T]he Board draws on a fund of knowledge and experience all its own, and its choice of remedy must therefore be given special respect by reviewing courts." NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939.

Finally, under the Act it has been decided that an employer must bargain in good faith with a certified union for a period of one year. Had the Union here lost its majority status soon after the election, the Company would not have been entitled to refuse to bargain on that ground but would have had to bargain for the entire year. See Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L. Ed. 125 (1954) (alleged loss of majority after election but *before* certification). The same result should be at least equally required when an employer does not bargain in good faith for a year and

when that failure to bargain and other employer acts contribute to the union's loss of majority status. Certainly this has been the law in this circuit. See NLRB v. Henry Heide, Inc., 219 F.2d 46 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 881, 99 L.Ed. 1277 (1955). Indeed, it has been suggested that the real question in this type of case is whether a bargaining order alone is enough or whether additional remedies should be fashioned. See Note, The Need for Creative Orders Under Section 10(c) of the National Labor Relations Act, 112 U. Pa.L.Rev. 69, 83–87 (1963); cf. NLRB v. Strong, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969).

For all of these reasons, I respectfully dissent from the refusal to grant the Board's petition for an order compelling the Company to bargain with the Union.