**CONTINENTAL INSURANCE COMPANY et al., Petitioners,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 638, 1072, Dockets 73–2194, 73–2424.

United States Court of Appeals, Second Circuit.

Argued March 11, 1974.

Decided April 9, 1974.

---

29. *Id.*, pp. 991–992.

Frederick T. Shea, New York City (Joel A. Forkosch, Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, of counsel), for petitioners.

Michael S. Wolly, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Alan D. Cirker, Atty., N. L. R. B., Washington, D. C., of counsel), for respondent.

Before MANSFIELD and TIMBERS, Circuit Judges, and DAVIS,* Judge.

MANSFIELD, Circuit Judge:

Continental Insurance Company, Underwriters Adjusting Company and Underwriters Adjusting Company of Illinois (the "Company" herein) have petitioned us to review and set aside an order of the National Labor Relations Board (the "Board" herein) issued against the Company on July 11, 1973, directing it (1) to cease its refusal to bargain collectively in good faith with the American Communications Association, Communications Trade Division, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Union" herein) as the certified bargaining representative for certain Company employees located in two certified bargaining units, (2) to cease making changes in wages and other terms and conditions of employment of employees in the two units without giving notice to the Union and affording it an opportunity to bargain collectively with respect to such changes, and (3) to take affirmative action to carry out its bargaining duties under the Act. The order was based on the Board's finding that the Company had violated §§ 8(a)(5) and 8(a)(1) of the Act, 29 U. S.C. §§ 158(a)(5) and (a)(1).[1] The Board has filed a cross-application for enforcement of its order. The sole issue before us is whether there is substantial evidence in the record as a whole to support the Board's findings. We find that there is and accordingly deny the Company's petition and grant the enforcement requested by the Board.

On March 6, 1968, following elections conducted by the Board, the Union was certified as the bargaining representative for claims adjustors, examiners and investigators employed by the Company in two bargaining units, its New York City branch and a branch in Newark, New Jersey. Despite certification, the Company refused to bargain with the Union on the ground that the designated bargaining units were inappropriate, being limited to single branch offices. On April 15, 1969, we enforced a Board order requiring the Company to bargain in good faith with the Union, 409 F.2d 727 (2d Cir. 1969). Despite the passage of almost six (6) years since the certification of the Union as the exclusive bargaining agent and almost five (5) years since our original order no agreement has been reached by the parties. Part of this seemingly interminable delay is attributable to the Company's appeal from our enforcement of the Board's bargaining unit determination and order

---

* Of the United States Court of Claims, sitting by designation.

1. Section 8 of the Act, 29 U.S.C. § 158, provides in pertinent part:
"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\*  \*  \*  \*  \*

(5) to refuse to bargain collectively with the representatives of his employees. . . ."

which the Company unsuccessfully sought to have reviewed by the Supreme Court, 396 U.S. 902, 90 S.Ct. 215, 24 L. Ed.2d 178 (1969). As a result, the Company did not agree to sit down with the Union until December 1969.

The lion's share of the six-year delay arises from the parties' inability to reach agreement, despite some 27 bargaining sessions held during the period from December 1969 to June 22, 1971. During the course of these negotiations the Union on June 9, 1970, filed charges with the Board alleging that the Company, in violation of § 8(a)(5) and (1) of the Act, had failed to bargain in good faith. This led to the Board's issuance of a consolidated complaint to which the Company filed an answer amounting to a general denial. Hearings were held before Administrative Law Judge Herbert Silberman during the period from March 3, 1972, to July 25, 1972, culminating in his issuance of detailed findings and conclusions on December 13, 1972. He found that "the Company conducted its negotiations with no desire or intention of reaching any agreement with the Union," a conclusion based upon a detailed analysis of the evidence, which revealed that the Company had prolonged negotiations unduly by various delaying tactics, including unreasonable fragmentization of bargaining sessions, captious questioning of the Union's proposals, and presentation of Company proposals that were unnecessarily complicated, outside of the scope of mandatory collective bargaining, or patently unfair and unreasonable. He further found that the Company had violated its duty to bargain collectively with the Union by by-passing the Union as the employees' exclusive bargaining agent and dealing directly with the employees, unilaterally transferring some out of the unit and adjusting the wages of others. Since his description of the parties' negotiations and of the evidence underlying his findings is set forth in careful detail in his decision, we see no necessity for restating the evidence here except to the extent that we refer below to selected items which play a part in determining whether his findings are supported by substantial evidence.

In a decision and order entered on July 11, 1973, the Board, affirming *in toto* the Administrative Law Judge's findings and conclusions, adopted his recommended order. Chairman Miller dissented from the finding of refusal to bargain in good faith, contending that the Company's conduct in certain respects amounted to no more than "hard bargaining." However, he joined in the Board's affirmance of the conclusion that the Company had violated § 8(a)(5) and (a)(1) by failing to notify the Union in advance of the Company's intent to transfer certain employees out of one of the units to a new branch office in Hackensack, New Jersey, and by unilaterally establishing overtime rates for work in packing and shipping files to Hackensack.

## DISCUSSION

The Board's findings must, of course, be upheld if they are supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Fitzergerald Mills Corp., 313 F.2d 260, 268 (2d Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). At the outset we summarize those basic principles by which we are governed in reviewing a charge of bad faith bargaining.

The duty imposed on the parties under § 8(a)(5) to bargain collectively does not obligate a party to make concessions or yield a position fairly maintained, NLRB v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); NLRB v. Patent Trader, 415 F.2d 190 (2d Cir. 1969), modified, 426 F.2d 791 (2d Cir. 1970); NLRB v. General Electric Co., 418 F.2d 736, 756 (2d Cir. 1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L. Ed.2d 257, rehearing denied, 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970). On the other hand, the

parties are obligated to do more than merely go through the formalities of negotiation. There must be a "serious intent to adjust differences and to reach an acceptable common ground," NLRB v. Insurance Agents Union, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960). To conduct negotiations as a kind of charade or sham, all the while intending to avoid reaching an agreement, would of course violate § 8(a)(5) and amount to "bad faith" bargaining. Sophisticated pretense in the form of apparent bargaining, sometimes referred to as "shadow boxing" or "surface bargaining," see NLRB v. Herman Sausage Co., 275 F.2d 229, 232 (5th Cir. 1960), will not satisfy a party's duty under the Act; and where years pass without an agreement being reached, the conduct of the parties must be scrutinized carefully, especially when experience discloses that collective bargaining agreements are usually reached in a fraction of that time.

The problem, therefore, in resolving a charge of bad faith bargaining, is to ascertain the state of mind of the party charged, insofar as it bears upon that party's negotiations. Since it would be extraordinary for a party directly to admit a "bad faith" intention, his motive must of necessity be ascertained from circumstantial evidence, NLRB v. Patent Trader, *supra* 415 F.2d at 197 (2d Cir. 1969). Certain specific conduct, such as the Company's unilateral changing of working conditions during bargaining, may constitute *per se* violations of the duty to bargain in good faith since they in effect constitute a "refusal to negotiate in fact," NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Absent such evidence, however, the determination of intent must be founded upon the party's overall conduct and on the totality of the circumstances, as distinguished from the individual pieces forming part of the mosaic. NLRB v. General Electric Co.,

*supra* 418 F.2d at 756. Specific conduct, while it may not, standing alone, amount to a *per se* failure to bargain in good faith, may when considered with all of the other evidence, support an inference of bad faith.

Applying these principles here, we are satisfied from our examination of the record as a whole that substantial evidence supported the Board's finding that the Company had bargained in bad faith. Viewed in its entirety the record reveals that the Company pursued a pattern of tactics designed to delay the negotiations as long as possible, to denigrate and undermine the Union, to make it impossible for the Union to reach a collective bargaining agreement without virtually surrendering its right to represent the employees in disputes over working conditions, and to make it appear to the employees that they would be worse off with Union representation and a collective bargaining agreement than if they had neither. Since the Board's findings are amply supported by persuasive proof it is unnecessary for us to analyze in detail each and every aspect of the Company's conduct evidencing its insincerity. A few examples will suffice.

At the outset of negotiations, which were delayed for more than 1½ years by the Company's pursuit of an appeal from the Board's bargaining unit determinations, the Company refused to bargain jointly for its two units certified by the Board, even though the Company was represented by one spokesman for both units, Frederick T. Shea, Esq., the Union's proposals for both were virtually identical, and joint negotiations would minimize delay without in any way affecting the Company's right to bargain separately for each unit. Instead the Company insisted upon wasteful; duplicative sessions with respect to each unit, which necessitated repetitious discussion of identical terms and unnecessarily prolonged the bargaining process.[2]

---

2. That the Company could have bargained simultaneously for both units without any adverse effects upon its position is evidenced by the fact that it finally did so in the last few meetings, which were held after more than a year of separate sessions.

From this evidence the Board was entitled to infer that the Company's objective was to delay and frustrate the bargaining process.

Turning to the content of the bargaining sessions themselves, the Company's proposals and its positions with respect to such basic terms and conditions as Union recognition, vacations, severance pay, wage rates, grievances and arbitration procedure all provide ample evidence of Company insincerity. For instance, in objecting to the Union's proposal for inclusion of the usual provision for recognition of the Union as the sole and exclusive collective bargaining representative for each of the units, the Company made wholly unreasonable demands with respect to matters entirely outside the scope of mandatory collective bargaining under the Act, such as that the Union agree not to organize or represent any other Company employees. When it came to severance pay, although the Company had been following the practice of paying such pay to terminated employees, it took the position for the first four months of negotiations that it was flatly opposed to severance pay. It then made a proposal which was so inadequate as to be patently disingenuous. Similarly, with respect to vacations the Company's sole representative for some time took the extraordinary position that vacations were not an earned right but were provided to enable employees to do a better job for the Company. He then proposed stringent eligibility requirements that disregarded existing practices permitting employees to select their vacations on the basis of seniority

Another Company proposal that could only serve as a roadblock related to grievance, arbitration and no-strike provisions. The Company proposal defined a "grievance" as "an alleged violation by the Company of the clear and unambiguous terms of the language explicitly set forth in [the] Agreement. . . ." The Company could determine whether or not it would allow a "grievance" which was properly processed by the Union to go to arbitration and the Union would be permitted to suspend the no-strike clause only if (1) either the Company or the Union did not wish to submit the matter in dispute to arbitration, (2) the matter in dispute constituted a "grievance," and (3) the Company had in fact violated the Agreement as alleged in the "grievance." These latter conditions—i. e., whether the matter in dispute constituted a "grievance" and whether the Company had in fact violated the Agreement—would be determined, in the event of a strike, by an arbitrator who would be picked exclusively by the Company.

Acceptance by the Union of the Company's proposal would have constituted a waiver of any right to process a grievance or strike arising out of any matter not specifically covered in the Agreement and, at the time it made this proposal, the Company was insisting on including only a limited number of subjects in the contract. Moreover, a Union determination that the no-strike clause was suspended because the Company had violated the explicit terms of the Agreement was subject to reversal by an arbitrator selected exclusively by the Company, with severe consequences for those who participated in the strike. We agree with the Administrative Law Judge's conclusion that under this proposal there would rarely be an instance "where the Union could safely consider the no-strike clause suspended." The effect of the clause would have been to place the employees in a worse position than if they had no contract at all and to require the Union in effect to waive its right to represent employees with respect to disputes over employment conditions. The Board was fully justified in concluding that the proposal was not made in good faith.

Another example of the Company's bad faith is found in the terms of its wage increase proposals, which were less than the increases given to its employees the previous year and which made no provision for retroactivity. Furthermore the Company proposed in effect to bargain individually with respect to each

separate employee by granting increases in such amounts and at such times as it deemed appropriate for the employee. Hand in hand with these foot-dragging proposals the Company sought to undermine the Union's position as the bargaining representative of the employees by continually refusing the Union's proposal that it put into effect the Company's suggested increases without prejudice to further bargaining on the subject, following which the Company put the increases into effect with an announcement to the employees blaming the Union for the delay.

Finally the Company's strategy of obstruction is supported by evidence of its unilateral transfer of six employees from its Newark unit to its newly opened Hackensack office, without any discussion with the Union on the subject until the Union learned of the transfers and demanded a meeting, and by its unilateral grant of salary adjustments without any opportunity to the Union to bargain over the matter. This conduct separately violated the Company's duty to bargain solely with the Union as the certified and exclusive bargaining agent of the employees and not to deal directly with the employees themselves. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Utica Observer-Dispatch v. NLRB, 229 F.2d 575, 577 (2d Cir. 1956); Lion Oil Co. v. NLRB., 245 F.2d 376, 378 (8th Cir. 1957). A unilateral grant of a wage increase constitutes an independent violation of the Act, regardless whether any showing of bad faith is made. NLRB v. Consolidated Rendering Co., 386 F.2d 699, 704 (2d Cir. 1967). The Company's conduct further evidences an intention to by-pass, undermine and discredit the Union as the exclusive bargaining agent in the two units. NLRB v. National Shoes, 208 F. 2d 688 (2d Cir. 1953); NLRB v. Century Cement Mfg. Co., 208 F.2d 84 (2d Cir. 1953).

We recognize that after considerable delay the Company withdrew or modified some of its more extreme and obfuscatory proposals. However, the time wasted on negotiation with respect to them served the Company's overall effort to frustrate arrival at an agreement, with the result that we are confronted with unconscionably protracted negotiations which have made a mockery of bargaining procedure, delaying the outcome for several years. We further appreciate that some of the Company's bargaining positions and proposals, standing alone, might not support the charges against it. When the totality of the circumstances are considered upon the record as a whole, however, we have no hesitancy in concluding that the Board's findings of unfair labor practices on the part of the Company were supported by substantial evidence.

The Board's application for enforcement of its order is granted and the Company's petition for review is denied.