# NATIONAL LABOR RELATIONS BOARD, Petitioner.

v.

## MILGO INDUSTRIAL, INC., Respondent.

### No. 299, Docket 77–4121.

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1977.

Decided Dec. 5, 1977.

---

Michael Murchison, N.L.R.B., Washington, D.C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Michael S. Winer, N.L.R.B., Washington, D.C., of counsel), for petitioner.

David M. Tolmach, New York City (Arthur R. Kaufman, Lynn C. Outwater, and Jackson, Lewis, Schnitzler & Krupman, New York City, of counsel), for respondent.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

The National Labor Relations Board (the NLRB or the Board) seeks enforcement of an order, 229 NLRB No. 13 (1977), entered pursuant to §§ 8(a)(5) and (1) of the National Labor Relations Act, requiring Milgo Industrial, Inc. (Milgo), a small Brooklyn, N.Y., business engaged in the manufacture and sale of metal construction items, metal sculpture, metal decorative and art objects, cut bodies and frames, and related products, to bargain with a union in good faith. Milgo had 15 to 20 employees in its shop in September, 1971, when Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO (the Union), commenced an organizing campaign and demanded recognition. This was refused and the Union filed an unfair labor practice charge. In the fullness of time the Board found in favor of the Union and directed bargaining, 203 NLRB 1196 (1973), and this court entered an order of enforcement, 497 F.2d 919 (1974).

The Union, on July 1, 1974, called upon Milgo to bargain. Some fifteen months later, on October 1, 1975, it filed a second charge, alleging that Milgo had engaged in sham bargaining.[1] After a three day hearing in late March, 1976, an administrative law judge (ALJ) filed a decision on June 22, 1976, finding that Milgo had failed to bargain in good faith in that it withheld information relevant to the Union's performance of its duties as bargaining representative, unreasonably delayed the holding of bargaining meetings, and haggled over insignificant details. Some nine months later, on April 18, 1977, a three member panel of the Board affirmed the ALJ's findings and adopted his recommended order. The Board now seeks enforcement.

As Chief Judge Magruder stated in the leading case of *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1 Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953), in a situation like this "where the employer engaged in a lengthy series of bargaining conferences, which got nowhere," the question is "whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible, or that it bargained in good faith but was unable to arrive at an acceptable agreement with the union." See also

---

1. This followed the filing of a decertification petition and Milgo's refusal to negotiate thereafter. Milgo does not contend that possible loss of support by the Union during the period prior to the filing of the decertification petition relieved it of its duty to bargain. Failure to advance such a contention was well advised in light of *NLRB v. Patent Trader, Inc.*, 426 F.2d 791 (2 Cir. 1970) (*en banc*). We do not regard it as a significant distinction that the union in *Patent Trader* had been certified as a result of a Board conducted election whereas here the Union's majority status rested on authorization cards signed by 10 of 17 production and maintenance employees.

We were told at argument that the decertification petition had been dismissed pursuant to the NLRB's policy to do this whenever an unfair labor practice charge is pending and that bargaining had resumed.

*NLRB v. National Shoes, Inc.,* 208 F.2d 688, 691–92 (2 Cir. 1953); *NLRB v. Fitzgerald Mills Corp.,* 313 F.2d 260, 266 (2 Cir.), *cert. denied,* 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963); *NLRB v. W. R. Hall Distributor,* 341 F.2d 359, 362 (10 Cir. 1965); *Continental Insurance Co. v. NLRB,* 495 F.2d 44, 48 (2 Cir. 1974); *Queen Mary Restaurants Corp. v. NLRB,* 560 F.2d 403, 410 (9 Cir. 1977). Decision of that question is inevitably difficult, since it generally requires the drawing of inferences concerning a state of mind from many facts, no one of which would have great significance if it stood alone. Moreover, there is a tension between the statutory obligation to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement . . ." and the proviso that "such obligation does not compel either party to agree to a proposal or require the making of a concession. . . ." § 8(d). See Cox, *The Duty to Bargain in Good Faith,* 71 Harv.L.Rev. 1401, 1415–16 (1958). However, the prime way for a party to avail itself of the proviso is to declare an impasse after the failure of sincere efforts to resolve the issue and to face the consequences—not to engage in a play, or a ploy. Bad faith bargaining, as said by Judge John R. Brown in another leading case on the subject, *NLRB v. Herman Sausage Co.,* 275 F.2d 229, 232 (5 Cir. 1960), "is prohibited though done with sophistication and finesse. . . . [T]o sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail." While by enacting the Taft-Hartley Act and the Administrative Procedure Act Congress has imposed on the courts of appeals "responsibility for assuring that the Board keeps within reasonable grounds," *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951), those st₊ tutes were not "intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *Id.* at 488, 71 S.Ct. at 465. And the Board's power to draw reasonable inferences from the facts, free from a substitution of judgment by a court of appeals, remained unimpaired. *Radio Officers' Union v. NLRB,* 347 U.S. 17, 48–52, 74 S.Ct. 323, 98 L.Ed. 455 (1954). See also *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960) ("[W]e do not mean to question in any way the Board's power to determine [whether a party's conduct at the bargaining table evidences a real desire to come into agreement], drawing inferences from the conduct of the parties as a whole."); *NLRB v. Southwestern Porcelain Steel Corp.,* 317 F.2d 527, 528 (10 Cir. 1963) (question of good faith involves "subjective considerations, that must be left to the inference drawing function of the Board . . . .").

▬ All this is familiar doctrine which the employer cannot and does not challenge. Its case is rather that there was no substantial evidence of the subsidiary facts from which the ALJ and subsequently the Board drew the inferences that they did. With respect to one of the grounds on which the ALJ's conclusion rested, the failure to give necessary information, Milgo is partially right. This claim finally boiled down to two items—failure to supply the Union with a copy of the company's health plan and with the revised costs of its pension plan entailed by the then recently enacted Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* With respect to the first, Milgo informed the Union of the title of its Blue Cross-Blue Shield plan, which was in common use; if the Union did not have a copy in its files, a telephone call to Blue Cross-Blue Shield would have obtained one.[2] On the other hand, there was evidence, which the ALJ was entitled to credit, that the Union had

---

2. To be sure, as Board counsel argued, a phone call would also have enabled Milgo to obtain an

added copy if in fact it had none, and we do not applaud this type of dealing. However, one

specifically and repeatedly requested the revised pension costs entailed by ERISA and that Milgo failed to provide them. Since the information was clearly relevant to the Union's efforts to bargain on the subject, the failure to provide it was an unfair labor practice. *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *NLRB v. Acme Industrial Co., supra*, 385 U.S. at 435–36, 87 S.Ct. 565.[3]

With respect to the delays in holding bargaining sessions, Milgo has made an exhaustive examination of the evidence in an effort to show that the Union, which in June, 1975, was involved in other negotiations and which during three of the six months' § 10(b) period was concerned with a strike against other employers, bore more responsibility for delay than the ALJ had found; it also seeks to defend its record concerning the treatment of substantive proposals. We agree that the Union representative was not particularly aggressive as a negotiator and did not seem to treat the making of a contract with this small manufacturer as a high priority item. Indeed, if the decision had been ours to make, we might have determined that the General Counsel had not met his burden of persuasion on this issue; this case is nowhere near so clear against the employer as *Continental Ins. Co. v. NLRB, supra*, 495 F.2d 44, on which the Board relies.

 Still there are many facts supported by substantial evidence which bring the Board's conclusion on the issue of responsibility for the delays within the realm of rationality. Milgo confided primary negotiating authority to a busy outside attorney, making him an indispensable party to negotiations although he was out of town two or three days a week and had many other claims on his attention when he was in his office; the consequence was that the scheduling and the length of bargaining sessions became a matter of nearly as much moment as their content. On several occasions the company caused gaps of from one to three months. After a meeting on November 22, 1974,[4] Milgo's attorney asked for two or three weeks to prepare a new draft that would incorporate the few points on which agreement had been reached—a very generous amount of time for the small amount of uncomplicated redrafting that was required.[5] Yet the new draft was not forwarded to the Union until January 7, 1975 along with a letter apologizing for the inappropriate delay; the company's attorney cancelled a meeting scheduled for February 14 to discuss this; and discussions were not resumed until March 3. The company was responsible for another serious gap, this time within the § 10(b) period, when it cancelled a meeting scheduled for July 24 and did not reschedule it until September 3.[6] The Union president was unavailable on that date, and a meeting was finally arranged for September 11. Primarily as a result of the Company's actions, and despite the requests of the Union presi-

can hardly say that the Union lacked "information that is needed . . . for the proper performance of its duties," *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967), when this was so readily available to it.

3. Counsel for Milgo contended at oral argument that the Union in fact received the requested information since the pre- and post-ERISA costs of the pension plan were the same. If so, the Union should have been advised of this. Its repeated requests for pension costs after receipt of the pre-ERISA figures would indicate that it was not so advised.

4. While this was more than six months before the filing of the charge on October 1, 1975, see § 10(b), evidence of events prior to April 1, 1975 was admissible for the purpose of shedding light on the "true character of matters occurring within the limitations period." *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416–17, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960). See also *NLRB v. Fitzgerald Motels Corp., supra*, 313 F.2d at 264, where we stated: "The collective impact of long delay, found in part from evidence outside the six-month period, would be a proper basis for a finding by the N.L.R.B. that bargaining was not conducted in good faith."

5. Of the 21 sections in this draft, only three involved additions or deletions of more than two sentences to proposals previously put forward by the Union or Milgo.

6. Milgo's attorney told the Union president on July 24 that he would call back the next day. He failed to do so, and to return the Union's subsequent calls. Finally, on August 12, 1975,

dent for longer and more regular bargaining sessions, the parties met only 17 times over the course of 15 months, and then usually only for a few hours.[7]

■ On the issue whether Milgo's actions on substantive proposals evidenced a "sincere desire to reach agreement if possible," the Union president testified that Milgo objected for a time to a Union proposal which did little more than require it to obey federal law, i. e., to include age as one of the protected categories in the nondiscrimination clause, compare 29 U.S.C. § 621, *et seq.*, quibbled over a proposal which would allow the Union to post notices "relating to Union matters" on the bulletin board and declined to agree to provide a water cooler as contrasted to merely providing water. After six negotiating sessions, full agreement had been reached on only two of the 33 proposed contract sections; five more negotiating sessions produced only one more agreed clause; and the six last meetings added only three. None of the six agreed clauses related to pay or other employee benefits. We could go on but there is no need to do so. As we have said in another context, *United States v. Monica*, 295 F.2d 400, 401 (2 Cir. 1961), *cert. denied*, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962), this was a situation where each episode "gained color from each of the others"; in this as in other sham bargaining cases, the Board could legitimately conclude that

the whole was greater than the sum of the parts. Sufficient facts were proved by substantial evidence to warrant the Board's drawing the inference that it did.

■ The question remains whether the Board would have drawn that inference but for the finding of the ALJ concerning failure to furnish information on the company's health plan, which we have held to be unsupported by substantial evidence, and whether the proper course thus would not be to remand rather than to enforce. We doubtless have the power to do this. But a reviewing court is not mandated "to require the tedious process of administrative adjudication and judicial review to be needlessly dragged out while court and agency engage in a nigh endless game of battledore and shuttlecock with respect to subsidiary findings." *Erie-Lackawanna R. R. v. United States*, 279 F.Supp. 316, 354–55 (S.D.N.Y. 1967), *aff'd sub nom. Penn Central and N&W Inclusion Cases*, 389 U.S. 486, 518–19 n. 10, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). Our own expertise on the subject of remands leaves us in no doubt that the Board would enter a bargaining order without this one unsupported subsidiary finding just as it did with it; if the Board did so, we could not say it was acting without a rational basis. We need not engage in such an exercise in futility; it is high time that these six years of fencing be brought to an end in the shape of either an agreement or

the Secretary of the Union wrote to the attorney:

Three weeks have passed since you called off our scheduled meeting. Despite the fact that we have made a number of phone calls, you have failed to respond.
Please call to arrange for a meeting.

On August 18, 1975, the attorney responded by letter:

Due to a heavy case load, I will not be able to meet with you and Bill until September 3rd. Please let me know what time would be most convenient for the meeting on this date.

A lawyer's busy schedule is not an acceptable excuse for a failure to meet at reasonable times and bargain collectively. *NLRB v. Exchange Parts Co.*, 339 F.2d 829, 832 (5 Cir. 1965) ("[T]he inherent difficulty arising when a lawyer in full practice represents the employer in bargaining sessions, does not exempt the employer from the normal requirements that nothing be done for the purpose of stifling an op-

portunity for discussion."); *Franklin Equipment Co.*, 194 N.L.R.B. 643, 79 L.R.R.M. 1112 (1971); *Imperial Tile Co.*, 227 N.L.R.B. No. 254 (1977).

7. The Union president testified that he asked Milgo to expedite negotiations on August 8, 1974 (Appendix at 42), November 4, 1974 (Appendix at 158–59, 432), May 2, 1975 (Appendix at 328), and September 11, 1975 (Appendix at 344, 348). He also testified generally as to his response to Milgo's scheduling of meetings:

I was looking for more longer meetings and more consistent meetings and more consecutive meetings and I didn't have the possibility of enforcing the company to do so, that's all. (Appendix at 142). On cross-examination the Union president could not remember whether he had made a request at the May 2 meeting. Still, the ALJ permissibly found that the Union had frequently sought longer and more regular meetings.

an impasse after good faith bargaining. Here again we find aid in Chief Judge Magruder's opinion in *Reed & Prince, supra,* 205 F.2d at 139; he there said:

> Nor do we have to agree with the Board as to each and every one of the incidents which it specially emphasized in its decision as indicating a lack of good faith on the Company's part in the conduct of the bargaining negotiations. . . .
>
> There may be cases where the ultimate finding of an administrative agency rests in part upon findings of subsidiary fact, or inferences therefrom, which a reviewing court deems insupportable, and where, because the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous findings or inferences removed from the picture, it may be appropriate for the court to remand the case to the administrative agency for further consideration. But in view of the record in its entirety, we are satisfied that this is not such a case.

The order will be enforced.