666 F.2d 1044
 109 L.R.R.M. (BNA) 2092, 92 Lab.Cas. P 13,154
 PEASE COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Ohio Valley Carpenters District Council, United Brotherhood
of Carpenters and Joiners of America, Local No.
1787, AFL-CIO, Intervenor.
 No. 78-1395.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 15, 1980.
Decided Dec. 16, 1981.
 
 Thomas A. Brennan, Graydon, Head & Ritchey, Bruce A. Hoffman, Cincinnati, Ohio, for petitioner.
 Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Susan Williams, Washington, D. C., for respondent.
 Before KENNEDY and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 The Pease Company (the Company) petitions this Court to review and set aside an order of the National Labor Relations Board (the Board) directing the Company (1) to cease threatening employees that it would be futile to have a union represent them, (2) to cease its refusal to bargain collectively in good faith with the Ohio Valley Carpenters District Council, United Brotherhood of Carpenters and Joiners of America (the Union), and (3) to offer strikers, whom the Board found to be unfair labor practice strikers, immediate reinstatement and back pay upon their unconditional application.[1] The Board has filed a cross-application for enforcement of its order. We find that the Board's order is not supported by substantial evidence in the record as a whole. We therefore grant the Company's petition and deny enforcement of the Board's order.
 
 I.
 
 2
 The Company, an Ohio corporation, manufactures and sells prefabricated doors, houses and building products. The Union has represented the Company's production and maintenance employees since 1945. Until 1969 the Company operated with a single plant in Hamilton, Ohio. In that year a second plant was added in Fairfield, Ohio, and in 1974 a third plant was added in Hamilton, Ohio. The Union's representative status was extended to the new plants and employees in the three plants constitute a single bargaining unit.
 
 
 3
 The most recent contract between the Company and the Union was effective from March 1, 1974 through February 28, 1977. On November 1, 1976, the Union requested negotiations for a new contract and the parties agreed to begin negotiations on December 15. Since the Company is alleged to have engaged in mere surface bargaining, it is necessary to give the highlights of the eighteen bargaining sessions from December 15 to March 13, when the case was heard by the Administrative Law Judge (ALJ).[2]
 
 
 4
 At the first meeting, the Company made no substantive proposals, but proposed a six-point format for the negotiations: 1) the parties should be free to make proposals at any time; 2) they could change proposals at any time; 3) they could not trade language for money; 4) they should straighten out contract language first; 5) they should keep negotiations moving, without the necessity of a last-minute rush; and 6) they should regard all agreements as tentative until total agreement was reached. The Union went through approximately half of the 1974 contract and indicated proposed changes.
 
 
 5
 The day before the second meeting, on January 14, Operations Manager William Schnitzler attended a grievance meeting with the Union President, Jesse McVey, and the Union's Chief Negotiator, Edwin Swope. According to testimony by McVey and Swope before the ALJ, Schnitzler remarked at the close of the meeting that he would not have to hear any more grievances in eight weeks, when the present contract was due to expire. They also testified that in December Schnitzler had made a derogatory remark to a subcontractor about union help, followed by the comment that in a couple of months he would not have to worry about it. These remarks were interpreted as an indication that the Company did not intend to reach agreement with the Union on a new contract.
 
 
 6
 At the second session, on January 5, the Union introduced a proposal to limit the Company's right to subcontract. The Company made three major proposals: to limit seniority to the plant rather than the unit; to reduce the period of layoff status without loss of seniority from eighteen months to six months; and to increase the probationary period for new employees from thirty to ninety days. The parties did not reach agreement on any of these proposals.
 
 
 7
 On January 19, a third meeting was held. The Union modified its position on subcontracting, proposing that an employee displaced by subcontracting receive severance pay or be given the right to transfer to another Company plant without loss of seniority or other contractual rights. The Company modified its stance on the plant seniority issue with an offer to retain unit seniority for employees hired before April 1, 1969. The Company also sought equalization of overtime. Again no agreement on these proposals was reached.
 
 
 8
 Further meetings were held on February 1, 8, 18, 23 and 24. Subcontracting continued to be a major source of disagreement. The Company presented revisions of its proposals to establish plant seniority, to reduce the period of employee status on layoff and to reduce the role of seniority in the assignment of overtime. On February 18, the Company proposed a job reclassification scheme, and separate meetings were held to discuss its application to each of the three plants. On February 27, the Company proposed to delete the shop rules from the contract. The Union did not agree to any of these Company proposals. A federal mediator joined the negotiations on February 24 and urged the parties to present their economic proposals notwithstanding the extensive disagreements over contract language.
 
 
 9
 On February 25, the Union held a meeting to inform its membership of the progress of the negotiations and to take a strike vote. The employees voted to strike, and actually went out on strike on March 1, after an unproductive session on February 28.
 
 
 10
 The Union and the Company continued to meet after the strike. The Union submitted a wage proposal which called for a 42 percent wage increase over the term of the contract. The Company's proposal provided no wage increases and placed a cap on the cost of living adjustment clause contained in the previous contract. There was some movement on the probationary period issue. The Union suggested a forty-five day period, and the Company responded by lowering its suggested period from ninety to sixty days, but no agreement was reached. Similarly, on the issue of employee status during layoff, the Company proposed a one-year retention of employee status for senior employees and nine months for junior employees. The Union, however, would accept no reduction of the eighteen month retention period provided by the previous contract, having originally sought extension of the period to twenty-four months. On April 13, six weeks after the strike began, the Company tightened its previous positions. It withdrew its cost-of-living adjustment proposal, proposed that the Union security clause for employees hired after March 1 be eliminated, and proposed that supervisors be permitted to do unit work.
 
 
 11
 On April 29, the parties met, but agreed to meet again only if the mediator thought it necessary. By mid-June, the Company had hired about 220 replacements and all three unionized plants were in operation.
 
 
 12
 The Board, in agreement with ALJ, found that the Company had violated §§ 8(a) (1) and (5) of the National Labor Relations Act (the Act) by failing to bargain in good faith with the Union. The Board, in disagreement with the ALJ, found that the statements alleged to have been made by Schnitzler also violated § 8(a)(1) of the Act by threatening that union representation would be futile. The Board further found the strike an unfair labor practice strike from its inception.
 
 II.
 
 13
 The Company contends that the Board's finding of a § 8(a)(1)[3] violation based on the two remarks attributed to Operations Manager Schnitzler is unsupported by substantial evidence. We agree.
 
 
 14
 Jesse McVey, the Union President, and Edwin Swope, the Union's Chief Negotiator for a new contract, testified that in December 1976 Schnitzler made a derogatory remark about union help to an independent contractor working in the plant, followed by the comment that in a couple of months he would not have to worry about it. Schnitzler admitted making the derogatory remark but asserted that it was made in September and denied stating that soon he would not have to worry about union help. The ALJ credited Schnitzler's account. The Board nonetheless held that Schnitzler's derogatory remark, coupled with the statement that soon he would not need to worry about union help, which the ALJ found was not made, conveyed the message that the Company did not intend to engage in good faith bargaining and that bargaining therefore, would be futile.
 
 
 15
 The Board is free to find facts and draw inferences different from those of the ALJ, but the reviewing court has an obligation to examine more carefully the evidence in cases where a conflict exists. Larand Leisurelies, Inc. v. NLRB, 523 F.2d 814 (6th Cir. 1975). Here McVey and Swope both testified that Schnitzler's statement was made after December 15. But as the ALJ noted, this testimony was clearly in error because the independent contractor to whom the statement was made did not work for the Company after December 3. The ALJ credited Schnitzler's testimony that the statement was made in September, was limited to a derogatory comment about union help, and made no reference to the upcoming negotiations. 237 N.L.R.B. at 1073 n.2. Yet the Board, without explanation, reversed the ALJ and credited the testimony of Swope and McVey that Schnitzler stated that he would not have to worry about the Union after a couple of months anyway. This determination is unsupported by substantial evidence, because the evidence conclusively establishes that Schnitzler's derogatory remark was made from three to six months before the expiration of the contract, at a time when a further remark about not having to worry about union help in a couple of months would have been nonsensical.
 
 
 16
 Schnitzler's second statement was made on January 4, 1977. As he left a conference room at the end of a grievance meeting, Schnitzler remarked that in a couple more months he would not have to hear any grievances. Schnitzler testified that this statement only reflected his belief that someone other than he would listen to grievances under the new contract, because he was spending an increasing amount of time at the Company's new Denver facility. The ALJ, while finding that the statement implied that there would be no new union contract, did not find that Schnitzler implied a Company determination not to negotiate a contract in good faith. The Board, however, found a § 8(a)(1) violation, holding that the statement implied that bargaining, and thus union representation, would be futile.
 
 
 17
 This statement does not support a § 8(a)(1) violation. This was an isolated remark made to the Union President and its Chief Negotiator. The statement was ambiguous; an innocent interpretation is clearly consistent with the words used, while a threat is present only by a strained interpretation. Where, as here, there is no background of antiunion animus by an employer, trivial and ambiguous conversations between a company official and an employee cannot form the basis of a § 8(a)(1) violation. St. Louis Car Division v. NLRB, 439 F.2d 1145, 1148 (8th Cir. 1971); Broadway Motors Ford, Inc. v. NLRB, 395 F.2d 337, 340 (8th Cir. 1968). We therefore conclude that the Board's finding of a § 8(a)(1) violation on the basis of this statement is unsupported by substantial evidence.
 
 III.
 
 18
 The ALJ began his discussion of the eighteen bargaining sessions with the observation that:
 
 
 19
 General Counsel does not contend, nor does the evidence show, that the Company ever refused to meet at reasonable times or with reasonable frequency, or that the Company ever failed or refused to discuss a proposal. During the first five or six sessions, which extended into February, the parties met from 1 p. m. to 3:30 p. m., when the first shift ended, at which time the Union representatives indicated that they wished to leave. As the contract expiration date approached, the parties met with increased frequency. All issues eventually were discussed between the parties, and the principal issues were discussed at length.
 
 
 20
 237 N.L.R.B. at 1074. Nonetheless, the ALJ and the Board concluded that the Company had failed to bargain in good faith, in that the Company had, in the Board's words:
 
 
 21
 Determined that it would not negotiate a contract except on its own terms, which it knew would be unacceptable to the Union and would force the Union to strike.
 
 
 22
 237 N.L.R.B. at 1069.
 
 
 23
 The Company contends that the ALJ and the Board erred in not finding that the Company simply was engaged in lawful hard bargaining. We agree.
 
 
 24
 The Company correctly notes that the "acceptability" of its proposals to the Union is the touchstone from which all the Board's findings of bad faith emanate. This approach has led the Board astray, because good faith bargaining does not require that Company to make proposals that are acceptable to the Union. Rather, the Company's duty to bargain is defined by § 8(d) of the Act, which states that:
 
 
 25
 To bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession ....
 
 
 26
 Thus the Company may insist on a proposal, however unacceptable to the Union, and if the insistence "is genuinely and sincerely held ... it may be maintained forever though it produce a stalemate." NLRB v. Herman Sausage Co., 275 F.2d 229, 231 (5th Cir. 1960). A lack of good faith may not be found merely because a party attempts to secure provisions that the other party deems unacceptable, but rather may be found only from "conduct clearly showing an intent not to enter into a contract of any nature." NLRB v. United Clay Mines, 219 F.2d 120, 125 (6th Cir. 1955).
 
 
 27
 The Board also errs when it predicates a finding of bad faith bargaining on the view that the Company's proposals forced the Union to strike. First, there is no indication that the Company would not have allowed the bargaining unit employees to keep working after the contract expired while negotiations continued. The Union's decision not to seek an extension merely reflected a determination that its interest would best be served by exerting economic pressure on the Company. Moreover, the decision by the Union to strike provides no evidence that the Company bargained in bad faith:
 
 
 28
 (T)here is nothing in the Act which gives employees the right to insist on their contract demands, free from the sort of economic disadvantage which frequently attends bargaining disputes.
 
 
 29
 American Ship Building v. NLRB, 380 U.S. 300, 313, 85 S.Ct. 955, 965, 13 L.Ed.2d 855 (1965). Thus employees have no right to insist that company proposals be acceptable to them without the need to resort to a strike to attempt to gain desired concessions.
 
 
 30
 The proper standard, then, is not whether the Company made proposals which were acceptable to the Union, but rather, whether the Company desired "to reach ultimate agreement, to enter into a collective bargaining contract." NLRB v. Insurance Agents, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960). Our examination of the specific indicia relied on by the ALJ and the Board leads us to conclude that neither the proposals nor the tactics of the Company, nor the sum of its conduct, amounts to substantial evidence of bad faith.
 
 
 31
 The ALJ found that the six-point format proposed by the Company was used "as a means of thwarting and frustrating agreement," that the Company acted in bad faith by disclosing its proposals "bit by bit over the course of negotiations," and that the time spent in negotiations prior to the strike "was grossly inadequate to enable the parties to arrive at a contract." 237 N.L.R.B. at 1074. We disagree. The ALJ conceded that the Union agreed to the proposed format, and no contention is made that the Union ever requested a departure from that format. The ALJ found the prohibition against trading contract language for better economic terms particularly offensive, but again, there is no indication that the Union desired to do so or would have been prevented from making such a proposal. As regards the alleged inadequacy of time, the record clearly establishes that the Company had disclosed what the ALJ termed its "principal objectives" by the fifth session on February 8. 237 N.L.R.B. at 1072. The Company's only other major proposal, the job reclassification scheme, was introduced on February 18. This permitted sufficient time for separate meetings at each plant and the formulation of the Union's response, which was to reject the Company's proposals. Thus the fact that no agreement had been reached by March 1 cannot be attributed to unlawful tactics of the Company, but must instead be acknowledged as the result of each party exercising its right not to agree to the proposals of the other party.
 
 
 32
 The ALJ also faulted the Company for not making enough concessions on issues of substance and for not making those concessions the Company was prepared to offer at an earlier stage of the negotiations. The ALJ stated that:
 
 
 33
 (A)lthough the Company submitted the plant-seniority proposal on January 6, it did not include a cutoff date until January 19, when it did so ostensibly to meet the Union's demand for protection of senior employees. This alleged concession was in any event more cosmetic than real, because employees with a seniority date prior to April 1, 1969, had such great seniority that they were virtually immune from economic layoff. Similarly, the Company made no real movement toward compromise on its proposal to reduce layoff status without loss of seniority from 18 months to 6 months. On March 14, 2 weeks after the strike began, the Company proposed a cutoff date of April 1, 1969, which would accord the senior employees layoff status for 1 year. In view of the Company's ostensible concern for senior employees and their virtual immunity from layoff, it is difficult to see why, if the Company were acting in good faith, it did not submit this cutoff date in its initial proposal, or soon thereafter. The Company made no movement in the direction of compromise on the real issue, i.e., layoff status of employees who faced a real possibility of layoff, until well after the strike began, when it verbally suggested the possibility of 9 months' layoff status for the junior employees with more than 18 months' seniority.
 
 
 34
 237 N.L.R.B. at 1074. This passage demonstrates the extent to which the ALJ wrongfully passed judgment on the timing and quality of the Company's concessions. As this Court has noted:
 
 
 35
 Nothing in the labor law compels either party negotiating over mandatory subjects of collective bargaining to yield on its initial bargaining position; good faith bargaining is all that is required.
 
 
 36
 McCourt v. California Sports, Inc., 600 F.2d 1193, 1200 (6th Cir. 1979). The ALJ's notions of good faith notwithstanding, a party is not required to lead with its best offer; it is free to bargain. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Furthermore, there is nothing in the record to indicate that earlier concessions on these issues would have led to an agreement in light of the other substantial issues separating the parties.
 
 
 37
 Several substantive proposals made by the Company were deemed to be indicative of its bad faith. These included the reduction of employee layoff status, the switch from unit to plant seniority, a longer probation period for new employees, modification of the method for assigning overtime, and the continuance of the Company's existing right to subcontract production. While unusually harsh and unreasonable proposals may support a finding of bad faith bargaining, NLRB v. Wright Motors, Inc., 603 F.2d 604 (7th Cir. 1979), the Company proposals challenged here do not meet this description.[4] The ALJ apparently believed that since the Company offered no concessions in the area of subcontracting it was obliged to offer better concessions in the other areas. 237 N.L.R.B. at 1076. But the law is well settled that "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." NLRB v. American Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952). See also Gulf States Mfrs., Inc. v. NLRB, 579 F.2d 1298, 1318 (5th Cir. 1978), rev'd in part on other grounds, 598 F.2d 896 (5th Cir. 1979) (en banc); NLRB v. Tomco Communications, Inc., 567 F.2d 871, 877 (9th Cir. 1978).
 
 
 38
 The ALJ also found that the Company withdrew its prior cost-of-living proposal after the strike to ensure that no agreement was reached. We disagree. The offer was not withdrawn at a time when agreement was imminent; even if the offer had not been withdrawn, substantial disagreement would remain over both economic and non-economic issues. Moreover, the offer was not withdrawn until six weeks after the strike began. An employer has a right to withdraw proposals made before a strike to reflect the changed economic background. Omaha Typographical Union, No. 190 v. NLRB, 545 F.2d 1138 (8th Cir. 1976); NLRB v. Alva Allen Industries, Inc., 369 F.2d 310 (8th Cir. 1966).
 
 
 39
 Though we have reviewed seriatim various factors relied on by the Board for its determination that the Company has engaged in bad faith bargaining, we recognize that the ultimate finding of bad faith is based upon the totality of the circumstances. NLRB v. Milgo Industrial, 567 F.2d 540, 545 (2d Cir. 1977). We conclude, however, that this is simply a case of hard bargaining between two parties who used their respective economic power to their best advantage. We hold that there is not substantial evidence on the record as a whole to support the Board's finding that the Company failed to bargain in good faith in violation of § 8(a)(1) and (5) of the Act.
 
 
 40
 The Board also found that the strike was an unfair labor practice strike. Inasmuch as we have determined that no unfair labor practice was committed by the Company, it follows that the strike was and continued to be an economic strike from its inception.
 
 
 41
 Accordingly, the Company's petition to review the Board's order is granted, and the Board's cross-petition for enforcement is denied.
 
 
 
 [1]
 237 N.L.R.B. 1069 (1978)
 
 
 [2]
 Reconstruction of the course of negotiations was made unduly difficult by the failure of the ALJ to provide a chronological account of the meetings. Though the ALJ stated that a "session-by-session, blow-by-blow recitation of the negotiations" would have served no useful purpose, 237 N.L.R.B. at 1074, such a recitation would be the better practice where an allegation of surface bargaining has been made
 
 
 [3]
 Section 8(a)(1) provides that:
 It shall be an unfair labor practice for an employer-
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 ....
 Section 7 provides that:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).
 
 
 [4]
 In Wright, the company's proposals supporting a finding of bad faith included (1) a guarantee of an "open shop," limiting the union's right to secure members and check off authorizations, (2) a management rights clause, not subject to the grievance procedure, which gave the company exclusive control over hours, work rules, and production, and allowed the company to shut down its business without regard to the effect on employees, (3) a no-strike, no-lockout clause which required the union to fine any employee who engaged in a prohibited work interruption, granted the company the right to seek an injunction and damages against the union without arbitrating the claim, made all union members liable individually and collectively for damages, and required the union to waive its legal right to remove a suit from state to federal court, (4) an article on arbitration providing only limited and permissive arbitration, and (5) a provision allowing the company to set hourly wage rates and to grant promotions at its sole discretion. 603 F.2d at 608 n.5
 In Continental Insurance Co. v. NLRB, 495 F.2d 44 (2d Cir. 1974), a finding of bad faith was predicated in part on (1) the company's refusal to recognize the union as the sole and exclusive bargaining representative unless the union agreed not to organize or represent other company employees, (2) the company's insistence that arbitrators of grievances be picked exclusively by the company and (3) wage, vacation and severance pay proposals substantially less generous than the benefits provided to employees before the union was certified. 495 F.2d at 49.
 In NLRB v. Johnson Manufacturing Co., 458 F.2d 453 (5th Cir. 1972), a finding of surface bargaining was based on the Company's insistence that the Company retain complete and exclusive control of wages and working conditions, with the Union required to relinquish its right to bargain prior to any change.
 In NLRB v. Holmes Tuttle Broadway Ford, Inc., 465 F.2d 717 (9th Cir. 1972), the court found substantial evidence of bad faith where the Company, after months of bargaining leading to the Union's acceptance of its proposals, raised spurious objections to its own proposals, and then stated that it would only sign a contract of seven weeks duration.
 The Company's proposals in the instant case, unlike the company proposals discussed above, are not harsh, vindictive or unreasonable.