868 F.2d 854
 130 L.R.R.M. (BNA) 2773, 111 Lab.Cas. P 11,039
 LITTON MICROWAVE COOKING PRODUCTS DIVISION, LITTON SYSTEMS,
INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
United Electrical, Radio & Machine Workers of America, and
Local 1139, Intervenor.
 Nos. 87-5583, 87-5738.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 20, 1988.
Decided Feb. 27, 1989.
 
 M.J. Diederich (argued), Beverly Hills, Cal., for petitioner/cross-respondent.
 Leroy L. Hodge, Pittsburgh, Pa., for intervenor.
 Aileen Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., W. Christian Schumann, Joseph Oertel (argued), Washington, D.C., Ronald M. Sharp, Director, Region 18, NLRB, Minneapolis, Minn., for respondent/cross-petitioner.
 Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 BOYCE F. MARTIN, Circuit Judge.
 
 
 1
 Litton Microwave Cooking Products Division of Litton Systems, Incorporated appeals and the National Labor Relations Board seeks enforcement of an unfair labor practice order issued by the National Labor Relations Board, 283 N.L.R.B. No. 144 (May 15, 1987), which found Litton to be in violation of Sec. 8(a)(1) and Sec. 8(a)(5) of the National Labor Relations Act. We reverse the decision of the Board.
 
 
 2
 The issue before us concerns the decision of Litton to transfer the production of microwave ovens from its facilities in Minneapolis, Minnesota to its plant in Sioux Falls, South Dakota. Prior to 1977, Litton produced all of its microwave ovens (a domestic countertop oven, an international countertop oven, a commercial oven and a kitchen range with an oven) at facilities located near Minneapolis, where its employees were represented by intervenor United Electrical, Radio and Machine Workers of America and its Local 1139. In 1977, Litton established a new plant in Sioux Falls and began manufacturing domestic countertop ovens. By November 1981, Litton had ceased producing domestic countertop ovens in Minneapolis and was manufacturing all of these particular ovens in Sioux Falls. Before the establishment of the Sioux Falls plant, over 1,200 employees were represented by the Minneapolis bargaining unit. As the number of employees at the Sioux Falls facility increased, the number of employees at the Minneapolis plant decreased through lay-offs until, by November 1981, there were no more than 350 bargaining unit jobs remaining in Minneapolis. During the period from 1977 through 1981, the intervenor union did not contest the transfer of production from Minneapolis to Sioux Falls.
 
 
 3
 In 1981, Litton and the union began to discuss the relocation of the production of the international countertop ovens. Thomas Phillips, vice president of Human Resources for Litton, told Rocco DeMaio, financial secretary of Local 1139, that Litton was losing $3,000,000 annually on its range business, and, as a result, Litton was beginning a study to determine where it could most effectively manufacture its products. In October 1981, Phillips informed DeMaio that Litton would transfer the production of certain international models to Sioux Falls and would consequently reduce its work force in Minneapolis.
 
 
 4
 On November 5, 1981, Phillips and DeMaio, along with several other representatives of Litton and the union, met to discuss the transfer of production. DeMaio gave Phillips a letter with a formal request for studies and analyses concerning the relocation of work so that the union would have the information necessary to prepare for Litton a proposal designed to keep jobs in Minneapolis. Phillips denied that Litton had any formal studies or analyses relevant to the transfer of production and also stated that Litton had no obligation to bargain with the union over the decision to transfer work. Phillips maintained, however, that Litton was prepared to discuss the effects of the decision to relocate production. Discussions concerning the union's request for information continued for several days, as DeMaio asserted repeatedly that the union lacked the information necessary for it to make a proposal regarding the transfer of production. Later that month, Phillips notified DeMaio that the production of the international models would be relocated to Sioux Falls.
 
 
 5
 In March 1982, Phillips informed DeMaio that Litton was conducting studies concerning the transfer of production of the commercial microwave ovens. On March 9, Phillips and DeMaio met to discuss the relocation of the commercial line to Sioux Falls. DeMaio made a request for information relating to the relocation, which included a request for the same information that he had asked for in his letter of November 5. Phillips advised DeMaio that Litton would share with the union the data it had considered when examining the feasibility of relocating production to Sioux Falls. After several exchanges of letters, Phillips and DeMaio met again on March 19. At this meeting, DeMaio repeated his requests for more information, and Phillips replied that the union had received all relevant information. Phillips also stated that no formal studies or analyses existed. At the final meeting on March 26, DeMaio again requested studies and analyses and declared that he was not prepared to go ahead until he had received the requested information. On that same day, Phillips told DeMaio that Litton had decided to transfer the production of commercial ovens to Sioux Falls.
 
 
 6
 Following the filing of unfair labor practice charges by the union, the Regional Director of the National Labor Relations Board issued a complaint against Litton. The complaint, as subsequently amended, alleged in relevant part that Litton had violated sections 8(a)(1), (3), (5) and 8(d) of the National Labor Relations Act (29 U.S.C. Secs. 158(a)(1), (3), (5) and 158(d)) during 1981 and 1982 by relocating certain bargaining unit work in repudiation of its collective bargaining obligations.
 
 
 7
 An administrative law judge heard the complaint against Litton during April and June of 1983. On December 9, 1983, the administrative law judge issued his decision, recommending that the complaint be dismissed in its entirety because the management rights clause in the collective bargaining agreement between Litton and the union reserved for Litton the right to relocate production unilaterally.
 
 
 8
 The union and the General Counsel of the National Labor Relations Board filed exceptions to the administrative law judge's decision, and the case was submitted to the Board for decision. On May 15, 1987, a three-member panel of the Board issued a split decision. Two members of the Board joined in a decision to reverse the order of the administrative law judge; they found that Litton had violated sections 8(a)(1) and (5) by failing or refusing to bargain in good faith with Local 1139 concerning the relocation of the international and commercial lines and by failing or refusing to furnish the union with available information necessary for and relevant to the union's function as bargaining representative. The dissenting member of the Board agreed with the administrative law judge that the management rights clause in the parties' collective bargaining agreement permitted Litton's unilateral relocation of its international and commercial lines.
 
 
 9
 On appeal, the National Labor Relations Board seeks enforcement of its order, arguing that substantial evidence supports its conclusions that Litton violated sections 8(a)(1) and (5) by refusing to bargain over the relocation of production and by refusing to supply available, relevant information to the union. Litton requests that the Board's decision be set aside because: (1) its decision to transfer production of microwave ovens was not a mandatory subject of bargaining under section 8(d); (2) the management rights clause reserved to it the right to relocate production; (3) the union waived any right it had to bargain over the transfer of production; and (4) it provided the union with available, relevant information. We agree with Litton that the administrative law judge correctly interpreted the management rights clause as reserving Litton's right to transfer production unilaterally.
 
 
 10
 Our standard of review is well established. We may not disturb the findings of the National Labor Relations Board where there is substantial evidence on the record considered as a whole to support the Board's findings. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). A court reviewing the substantiality of evidence supporting a Board decision "must take into account whatever in the record fairly detracts" from the weight of the evidence, Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464, and the evidence supporting a Board conclusion may be less substantial when an examiner, such as an administrative law judge, has drawn conclusions different from the Board's than when the examiner has reached the same conclusion. Universal Camera, 340 U.S. at 496, 71 S.Ct. at 468. Although the Board is free to find facts and to draw inferences different from those of the administrative law judge, a "reviewing court has an obligation to examine more carefully the evidence in cases where a conflict exists." Pease Co. v. National Labor Relations Board, 666 F.2d 1044, 1047-48 (6th Cir.1981); Larand Leisurelies, Inc. v. National Labor Relations Board, 523 F.2d 814, 820 (6th Cir.1975). The significance, on review, of an administrative law judge's decision largely depends on the importance of witness credibility in the particular case, Universal Camera, 340 U.S. at 496, 71 S.Ct. at 468, and we will not normally disturb the credibility assessments of the Board or an administrative law judge, "who has observed the demeanor of the witnesses." National Labor Relations Board v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984); National Labor Relations Board v. Cement Transport, Inc., 490 F.2d 1024, 1029 n. 5 (6th Cir.1974).
 
 
 11
 Because the National Labor Relations Board and the administrative law judge reached differing conclusions in this case, it is appropriate for us to examine carefully the evidence supporting the Board's order. Pease, 666 F.2d at 1047-48; Larand, 523 F.2d at 820. After thoroughly reviewing the record, we conclude that, under the above-described standards, the decision of the Board is not supported by substantial evidence.
 
 
 12
 Despite the existence of a broadly-phrased management rights clause in the collective bargaining agreement, a majority of the Board found that Litton had refused to bargain over the transfer of production in repudiation of its collective bargaining obligations. We cannot agree with this finding of the Board. The management rights clause reserved for Litton "all of the customary rights of management" including, but not limited to, the right to direct the working force, "to transfer, and to determine size of work force, layoffs, product and production methods." Thus, the management rights clause not only reserved all of the customary rights of management for Litton but also specifically reserved the right to determine production methods and the size of the work force and the right to lay off workers.
 
 
 13
 A collective bargaining agreement must, moreover, "be interpreted in light of the 'common law' of the shop--a composite of the history and practices of the industry and the disputing company and union." National Labor Relations Board v. Construction & General Laborers' Union, 778 F.2d 284, 289 (6th Cir.1985). See also United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579-80, 80 S.Ct. 1347, 1351-52, 4 L.Ed.2d 1409 (1960). An examination of the history and practices of Litton and the union in this case reveals that the union believed that the collective bargaining agreement permitted Litton to relocate production unilaterally. For example, the union never challenged the loss of bargaining unit jobs in Minneapolis that resulted from the transfer of domestic countertop oven production to Sioux Falls from 1977 to 1981. Even though the union was aware of the transfer of domestic countertop production and, in its newsletters, attributed the Minneapolis layoffs to the transfer of production to Sioux Falls, the union never requested bargaining over Litton's relocation of work during the 1977-81 period. In addition, during the 1982 negotiations, Litton proposed a more detailed management rights clause that DeMaio rejected as being unnecessary because Litton had the right to do anything it wanted under the existing management rights clause.
 
 
 14
 We must also question the substantiality of the evidence supporting the Board's finding that Litton repudiated its obligation to bargain over the relocation of production because the Board apparently disregarded the administrative law judge's assessments of the credibility of important witnesses. The administrative law judge observed the demeanor of witnesses Phillips and DeMaio, and stated in his decision that Phillips testified "precisely, unequivocally and unambiguously" while DeMaio was "evasive and clearly bent on making his case." As a consequence, the administrative law judge discredited DeMaio's testimony. The Board's decision rests, in part, upon the testimony of DeMaio, a witness specifically discredited by the administrative law judge who observed his demeanor, and we believe that this disregard of the credibility assessments of the administrative law judge "fairly detracts" from the weight of the evidence supporting the Board's conclusions. Universal Camera, 340 U.S. at 488, 496, 71 S.Ct. at 464, 468. See also Baja's Place, 733 F.2d at 421; Cement Transport, 490 F.2d at 1029 n. 5.
 
 
 15
 The Board argues that the management rights clause did not reserve to Litton the right to relocate production in "clear and unmistakable" language, as required by law, and that Litton therefore violated its collective bargaining obligation to bargain over the transfer of production. See Metropolitan Edison Co. v. National Labor Relations Board, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); Timken Roller Bearing Co. v. National Labor Relations Board, 325 F.2d 746, 751 (6th Cir.1963). However, given the explicit reference to layoffs and production methods in the management rights clause, the history of uncontested work relocation and layoffs, and the unfavorable assessment by the administrative law judge of the credibility of a witness relied upon by the Board, we conclude that the Board's position is not supported by substantial evidence.
 
 
 16
 In summation, we agree with the administrative law judge's determination that the management rights clause in the collective bargaining agreement reserved for Litton the right to transfer production from Minneapolis to Sioux Falls unilaterally. Litton did not, therefore, violate any obligation to bargain with the union over the relocation of production or to provide the union with information relevant to bargaining over the relocation of work. We consequently find that the National Labor Relations Board's decision that Litton violated sections 8(a)(1) and (5) by refusing to bargain with the union over the relocation of work and by refusing to provide the union with information relevant to the relocation to be unsupported by substantial evidence. Because we believe that Litton did reserve for itself the right to relocate production, we need not consider and we express no opinion as to whether such relocation of production is, in the absence of a provision effectively reserving the right to transfer production, a mandatory subject of bargaining under Sec. 8(d) of the National Labor Relations Act.
 
 
 17
 Accordingly, we grant Litton's petition to review the order of the National Labor Relations Board, and we deny the Board's cross-application for enforcement of its order.
 
 
 18
 It is so ordered.